**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

| | |
|---|---|
| **VERONICA WATSON,**<br>individually and on behalf of all others similarly situated,<br>*Plaintiffs,*<br>v.<br>**FRANCISCAN ALLIANCE, INC.**,<br>an Indiana nonprofit corporation,<br><br>*Defendants* | Case No.<br><br><br><br><br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Veronica Watson ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint ("Complaint") against Defendant Franciscan Alliance, Inc. ("Franciscan" or "Defendant"), and alleges as follows based upon personal knowledge as to Plaintiff's own acts and experiences, and upon information and belief, including investigation by counsel, as to all other matters:

## NATURE OF THE ACTION

1. This is a class action lawsuit arising from Franciscan's systematic interception and disclosure of patients' and website visitors' sensitive personal health information and electronic communications to third parties, including The Trade Desk, without prior notice or consent, through tracking technologies embedded in Defendant's website, www.franciscanhealth.org ("Website").

2. Franciscan is a healthcare system headquartered in Mishawaka, Indiana, with more than 19,000 employees and operating twelve hospitals and numerous medical

practices across Indiana and Illinois. Through its Website, Franciscan allows visitors to search for physicians and medical facilities, explore health services, pay for care, and register for support groups, courses, and other programs.

3. Unbeknownst to Website visitors, Franciscan has knowingly implemented third-party tracking technology on its Website, including The Trade Desk tracking platform ("The Trade Desk Tracker"). When Website visitors search for doctors or medical specialists, research health conditions, seek information about specific medical services, or interact with other health-related content, Franciscan enables The Trade Desk to intercept these electronic communications without consent.

4. The intercepted information includes: (a) the names, specialties, and locations of physicians from whom users are seeking treatment; (b) users' health conditions and medical concerns; (c) the locations or facilities where users are seeking treatment; (d) the types of medical services or procedures users are seeking; (e) search queries containing sensitive health information; and (f) users' attempts to schedule appointments with healthcare providers.

5. This interception of private electronic communications occurs in real-time, without appropriate notice to visitors and without obtaining their consent, in violation of: (1) the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511 et seq.; (2) common law protections against invasion of privacy; and (3) principles of unjust enrichment.

6. Through this action, Plaintiff seeks to remedy these widespread privacy violations on behalf of a nationwide class, obtain appropriate remedies for thousands of affected individuals, and prevent the continued unauthorized interception of patients' electronic communications through Defendant's Website.

## PARTIES

7. Plaintiff Veronica Watson is a natural person and citizen of Illinois who resides in Park Forest, Illinois.

8. Defendant Franciscan Alliance, Inc. is a nonprofit corporation organized under the laws of Indiana, with its principal place of business at 1515 Dragoon Trail, Mishawaka, Indiana 46544. Franciscan operates hospitals in this District. Franciscan operates the Website directed to patients in this District and controls the implementation of tracking technologies on that Website.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because: (a) this is a class action involving more than 100 class members; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) minimal diversity exists because at least one member of the proposed class is a citizen of a state different from at least one Defendant.

10. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, specifically the Electronic Communications Privacy Act, 18 U.S.C. § 2511 et seq.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy.

12. This Court has personal jurisdiction over Defendant as it conducts substantial and continuous business within Illinois and this judicial district. Defendant operates multiple healthcare facilities within the Northern District of Illinois, including Franciscan Health Chicago Heights and Franciscan Health Olympia Fields. Defendant actively targets Illinois residents through its interactive Website, which allows users to find physicians based in Illinois, schedule appointments at its local facilities, and engage with its Illinois healthcare operations. This lawsuit arises directly from Defendant's conduct related to this Website, specifically its implementation of tracking technology that intercepted the private electronic communications of Illinois residents accessing the site from within this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Specifically, Plaintiff and Class Members who reside in the Northern District of Illinois used computers located within this District to access Defendant's Website. The alleged unlawful interception of their sensitive electronic communications, the central harm in this

case, occurred while these users were physically present in this District. Furthermore, the website interactions concerned the seeking of medical services from Defendant's physicians and facilities located within this District.

## FACTUAL ALLEGATIONS

*i. Overview of Website Tracking on Healthcare Websites*

14. Various companies have recently developed website trackers that collect personal data about users' online activities. These tracking technologies have become increasingly sophisticated, evolving from simple cookies to complex tracking systems that can monitor detailed user behavior across websites and devices.

15. Website-tracking technologies typically function by placing small pieces of code on websites that are downloaded to a user's browser when they visit the site. Invisible to website users, this code enables the collection of various types of data about the user's interactions with the website, which is transmitted to third-party servers.

16. One form of website tracking involves cookies, which are small text files stored on a user's device that identify users and their browsing activity. First-party cookies are placed by the website the user is visiting directly, while third-party cookies are placed by parties other than the one the user is visiting. These third-party cookies enable tracking across multiple websites and are commonly used for advertising and analytics purposes.

17. JavaScript-based trackers represent a more sophisticated tracking method. Website owners implement these trackers by embedding JavaScript code snippets into their website's source code. When a user loads a webpage containing such code, the tracker

is downloaded onto the user's browser, where it activates and collects data about user behavior, which is then transmitted to the tracker provider's servers in real-time.

18. The interception of healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

19. As detailed in this Complaint, Franciscan has implemented such tracking technology on its Website, resulting in the unauthorized interception of visitors' electronic communications by The Trade Desk.

*ii. The Trade Desk Tracking Platform*

20. The Trade Desk, Inc. ("The Trade Desk") is a publicly traded technology company headquartered in Ventura, California, that operates one of the world's largest advertising platforms. With annual revenues exceeding $2.4 billion, its platform enables advertisers and advertising agencies to bid on and purchase advertising inventory from a wide array of sources in real-time. This allows for the automated buying of ad space across websites, mobile apps, connected TVs, and other digital channels. The platform provides sophisticated tools for targeting specific audiences, measuring campaign effectiveness, and optimizing advertising spend to achieve the best possible return on investment.

21. A core component of The Trade Desk's platform is its ability to serve highly targeted ads to consumers. When a user visits a website that has integrated The Trade Desk's technology, the platform collects data about that user's online behavior. This data,

which includes the websites they visit, the content they interact with, and their device information, is often combined with additional data from third-party data brokers and the advertiser's own customer information. By aggregating and analyzing this information, The Trade Desk enables advertisers to create detailed profiles of consumers. These profiles allow for highly targeted advertising, where ads are shown to individuals who are most likely to be interested in a particular product or service, based on their online activities, inferred interests, and demographic characteristics. This capability for granular audience segmentation and targeting is what makes the platform a powerful tool for advertisers and a significant concern from a privacy perspective.

22. To power its advertising platform and enable this data collection, The Trade Desk provides website operators with a tracking system that collects user interaction data.

23. Once implemented in a website's source code, The Trade Desk Tracker loads automatically and immediately whenever a user visits any page containing the tracking code. The tracking operates completely invisibly in the background, initiating outbound data transmissions to The Trade Desk's servers without any indication to users that their communications are being intercepted. The surreptitious nature of the tracker means that users typically have no idea that their electronic communications are being intercepted and transmitted to The Trade Desk.

24. When users interact with websites that include The Trade Desk Tracker, The Trade Desk assigns a persistent identifier known as the Trade Desk ID ("TDID"), which is stored as a cookie in users' browsers. The TDID is a unique alphanumeric string that

serves as a persistent digital fingerprint for each visitor across The Trade Desk's entire ecosystem.

25. The TDID functions as far more than a simple session identifier. It enables The Trade Desk to: (a) uniquely identify visitors across multiple websites and devices; (b) track visitor behavior across domains through persistent cookies; (c) create comprehensive user profiles based on browsing behavior; and (d) enable targeted advertising based on users' interests and online activities.

26. The Trade Desk's platform uses the collected data to produce a mapping of devices that may be related to each other, meaning that they might be used by the same person or by people within the same household. This cross-device tracking capability allows The Trade Desk to follow users across multiple devices and browsing sessions, creating a comprehensive profile of their online activities.

27. The Trade Desk profits from the intercepted data to profit by delivering targeted advertising campaigns tailored to users' interests and behaviors. When combined with data from across The Trade Desk's network of partner websites, this information enables precise identification and tracking of individuals throughout the internet ecosystem.

28. In addition to the TDID cookie, The Trade Desk Tracker collects users' IP addresses. An IP address is a globally unique numerical identifier that guides or routes communications across the internet. Often written as four sets of numbers separated by

periods (e.g.,94.140.9.22), Internet Service Providers assign IP addresses to networking devices such as modems or routers.

29. IP addresses function as the essential addressing system of the internet. Just as a telephone number routes calls to the correct household, an IP address is necessary for routing internet communications to the correct location. Importantly, IP addresses reveal the geographic location of internet users. Free online "IP lookup" services use databases that map IP addresses to geographic areas and potentially specific households, often providing information about the country, city, county, approximate coordinates, or even the internet service provider associated with the address.

30. The geolocation capability of IP addresses makes them valuable for digital advertising and tracking. IP addresses allow companies to target advertisements to users in specific geographic areas with over 95% accuracy and track user interactions across multiple websites, building detailed profiles of users' browsing habits tied to their location.

31. IP addresses are particularly powerful when combined with persistent identifiers like the TDID cookie. When individuals use their devices across different locations (home, work, coffee shops), each location has its own IP address. By tracking these movement patterns between different IP addresses and correlating them with the TDID cookie, The Trade Desk can build detailed profiles of individual users' daily routines and behaviors that distinguish them from others who may share the same IP address. This combination of TDID cookies and IP address patterns allows The Trade

Desk to identify and track specific individuals with remarkable precision, even when multiple people share the same household or workplace network.

32. For these reasons, Europe's General Data Protection Regulation ("GDPR") classifies IP addresses as "personal data," recognizing that even data that has been de-identified or pseudonymized but can be used to re-identify a person remains personal data. When The Trade Desk combines IP addresses with TDID cookies and the sensitive health information intercepted from Franciscan's Website, it creates a comprehensive digital profile that can identify specific individuals and their medical interests.

33. As further detailed in this Complaint, Franciscan has implemented The Trade Desk Tracker on its Website, enabling the interception of sensitive health information from Website visitors along with their IP addresses and persistent tracking identifiers.

*iii. Visitors to the Website Reasonably Expect Their Information to Stay Private*

34. Franciscan operates its Website as an extension of its healthcare services, facilitating patient care and the provision of health information. The Website allows users and patients to search for physicians by name, specialty, location, and other criteria; schedule appointments with physicians; explore health services and medical conditions; and locate medical facilities.

35. When using these online services, visitors input their medical information, including private and confidential information regarding their medical conditions and

treatment, with the reasonable expectation that such information will be kept confidential and used only for legitimate healthcare purposes.

36. Users of the Website reasonably expect that their communications and activities will remain private, particularly given Franciscan's status as a healthcare provider subject to HIPAA and other privacy regulations, as well as Franciscan's professional and ethical obligations to protect patient confidentiality.

37. This expectation of privacy is reinforced by longstanding regulatory principles and enforcement actions in the healthcare sector. Federal privacy regulations have long recognized that health information is entitled to broad privacy protections. In 2013, HHS clarified through formal rulemaking that information need not contain specific medical terms to be protected under HIPAA: if it "is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity." 78 Fed. Reg. 5566, 5598 (January 25, 2013).

38. Franciscan's conduct described in this Complaint is in violation of HIPAA, which imposes criminal penalties for knowingly disclosing individually identifiable health information ("IIHI") to third parties. 42 U.S.C. § 1320d-6(a)(3) defines IIHI as: "any information, including demographic information collected from an individual, that---(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an

individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual."

39. Franciscan intended to share and monetize its patients' IIHI, which is in violation of HIPAA and common law duties.

40. In 2023, the Federal Trade Commission and HHS warned healthcare providers via letter about their obligations to protect against impermissible disclosures of personal health information through web-tracking technologies, emphasizing that unauthorized disclosure of such information through trackers can violate federal law. The letter warned that "technologies, such as the Meta/Facebook pixel and Google Analytics, [] can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."

41. This expectation of privacy is further reinforced by Franciscan's "Notice of Privacy Practices." In this notice, Franciscan pledges that it is "committed to protecting medical information about you" and is required by law to "make sure that medical information that identifies you is kept private." The notice explicitly states that any "uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written permission." It further specifies that uses and disclosures requiring written permission include "marketing and sale of your protected health information." However, as detailed in this Complaint, Franciscan shares users' medical information with The Trade Desk for advertising purposes, a use not covered by

the notice and for which it has not obtained written permission, rendering these representations false.

42. Users would not reasonably expect that simply by visiting Franciscan's Website to search for doctors, schedule appointments, research medical conditions, or explore treatment options, their sensitive health information would be intercepted by The Trade Desk for purposes unrelated to their healthcare needs.

*v. Defendant's Implementation of The Trade Desk Tracker*

43. Franciscan has deliberately implemented The Trade Desk Tracker in the source code of its Website, procuring The Trade Desk to intercept sensitive health information and electronic communications of its patients and Website visitors without proper consent.

44. The Trade Desk Tracker operates on pages of the Website where users search for medical specialists, research health conditions, locate treatment facilities, and schedule appointments, intercepting information about users' activities on these pages. The tracker operates invisibly to Website visitors, who have no meaningful way of knowing that their sensitive health queries and browsing behaviors are being intercepted by The Trade Desk.

45. The information intercepted through this tracker includes electronic communications between the visitor and Franciscan regarding the visitor's healthcare interests, treatment-seeking behavior, and medical preferences. When combined with the

TDID cookie and a user's IP address, this information allows The Trade Desk to identify individual users and associate sensitive health information with their digital profiles.

46. The TDID, particularly when combined with users' IP addresses, creates a multi-layered digital fingerprint that allows The Trade Desk to track individuals across multiple devices and browsing sessions with exceptional precision. This combination enables The Trade Desk to: (a) identify specific individuals even when they move between different locations; (b) distinguish between multiple users of the same household or workplace network; (c) connect healthcare inquiries to specific individuals' broader online activities; and (d) build comprehensive profiles that include both health interests and geographic patterns of behavior.

47. Upon information and belief, The Trade Desk adds this intercepted healthcare-related data to its vast and sophisticated commercial advertising ecosystem, combining it with information from its network of partner websites. The data is used to create comprehensive user profiles that include sensitive health information which can be used for targeted advertising and other commercial purposes, including real-time ad bidding, behavioral segmentation, and cross-contextual tracking, all of which serve purposes entirely unrelated to the provision of healthcare. In procuring the interception and transmission of users' sensitive health-related information to The Trade Desk, Franciscan initiates the commercial exploitation of that information, an action at odds with the reasonable privacy expectations and the legal protections afforded to patients.

48. As demonstrated in the following examples, Franciscan procures the interception of sensitive personal health information without obtaining consent.

*v. Examples of Personal Data Collection and Disclosure on the Franciscan Website*

49. Franciscan's implementation of The Trade Desk Tracker results in the systematic interception of highly sensitive health information. The following examples demonstrate the scope and nature of these privacy violations:

50. **Physician Searches and Selection:** The "Find A Provider" page on Franciscan's Website allows users to search for physicians by typing into the search bar a name, condition, or specialty. When a user searches for a specific condition and selects a provider, this information is automatically transmitted to The Trade Desk. For example, when a user searches for physicians specializing in "HIV", The Trade Desk Tracker intercepts and transmits information to The Trade Desk including: (a) the search term "HIV"; (b) the TDID cookie that uniquely identifies the user; (d) the user's IP address revealing their geographic location; (e) a timestamp recording when the search occurred. This transmission creates a record linking the individual user to their search for HIV treatment.

51. When a user then selects a provider specializing in HIV treatment (such as Dr. Arshia Mohiuddin), The Trade Desk Tracker intercepts and transmits information to The Trade Desk including: (a) the full name of the selected physician; (b) the TDID cookie that uniquely identifies the user; (c) the user's IP address revealing their geographic location; and (d) a timestamp recording when the selection occurred. This transmission

creates a record linking the individual user to their search for HIV treatment and their selection of a specific HIV specialist.

52. **Appointment Scheduling:** When users proceed to schedule appointments with physicians through the Website, The Trade Desk Tracker intercepts this action. The tracker transmits information to The Trade Desk including: (a) the fact that the user clicked to schedule an appointment; (b) the name of the physician with whom the appointment is being scheduled; (c) the TDID cookie identifying the user; (d) the user's IP address; and (e) a timestamp recording when the event occurred. This creates a record that the identified individual at a specific geographic location is actively seeking medical care from a specific specialist.

53. **Location and Service Searches:** The Website's "Find a Location" feature allows users to search for medical facilities by filtering based on services offered. When users search for sensitive medical services, such as "wound healing," The Trade Desk Tracker intercepts and transmits information to The Trade Desk including: (a) the search term entered; (b) the specific service being sought; (c) the TDID cookie identifying the user; (d) the user's IP address; and (e) a timestamp recording when the search occurred. This links the individual's identity and location to their search for specific medical treatments.

54. **Conditions and Services Pages:** When users navigate to the "Conditions and Services" section and search for specific departments or treatments, The Trade Desk Tracker intercepts these interactions to The Trade Desk. For example, when a user

searches for "Obstetrics & Gynecology" and then clicks on "Natural Family Planning," the tracker transmits information to The Trade Desk including: (a) the initial search for obstetrics and gynecology services; (b) the subsequent visit to a page about of natural family planning; (c) the TDID cookie identifying the user; (d) the user's IP address; and (e) a timestamp recording when the search occurred. This creates a detailed record of the user's reproductive health interests tied to their identity and location.

55. **General Search Bar Queries:** Any information entered into the Website's general search bar is intercepted by The Trade Desk Tracker. When users search for conditions such as "vascular care," the tracker transmits information to The Trade Desk including: (a) the complete search query; (b) the TDID cookie identifying the user; (c) the user's IP address; and (d) a timestamp recording when the selection occurred. This enables The Trade Desk to build profiles of users' health concerns based on their search behavior and geographic location.

56. **Temporal Patterns and Behavioral Analysis:** In addition to the content of searches and interactions, The Trade Desk tracker also collects timestamp data showing precisely when each interaction occurs. This temporal information reveals behavioral patterns about users' healthcare-seeking activities. The timestamp data enables The Trade Desk to determine: (a) the complete progression of users' journeys through the Website, revealing potential connections between search terms, doctors' pages viewed, and conditions researched – effectively enabling the reconstruction of a user's medical decision-making process; (b) the evolution of users' health journeys by tracking the

sequence and timing of searches from initial symptoms to specific conditions to treatment options; (c) the urgency of users' health concerns based on search times (such as middle-of-the-night symptom searches indicating acute anxiety or medical emergencies); (d) the frequency and regularity of health-related searches, distinguishing between chronic condition management and acute health crises; (e) the duration users spend researching specific conditions, indicating their level of concern or the severity of their situation; and (f) patterns that may reveal work or life impacts of health conditions based on when searches occur (such as frequent searches during work hours suggesting conditions affecting employment). When combined with the specific health content being searched and the user's identity through TDID cookies and IP addresses, these temporal patterns can create an intimate portrait of users' physical and mental health states, revealing not just what health information they seek, but when they seek it, how urgently, and how their concerns evolve over time.

*v. Defendant's Responsibility for the Interception of Electronic Communications*

57. Although The Trade Desk performs the technical functions of intercepting electronic communications, Franciscan bears full legal responsibility for these actions as the entity that has procured The Trade Desk to intercept these communications.

58. Franciscan made the affirmative decision to implement The Trade Desk Tracker on its Website. This implementation was a deliberate action requiring Franciscan's web administrators to copy The Trade Desk's tracking code and insert it into the Website's source code. Without Franciscan's deliberate implementation of this code,

The Trade Desk would have no access to the electronic communications of Defendant's Website visitors.

59. Franciscan controls which pages of its Website contain the tracking code and could choose to exclude tracking from sensitive pages where healthcare information is accessed or inputted, yet it has chosen to implement tracking across these sensitive areas of its Website. Franciscan maintains complete control over its Website and has the ability to remove or modify the tracker at any time. Its continued use of this tracker represents an ongoing choice to procure The Trade Desk to intercept electronic communications from visitors to the Website.

60. Franciscan has procured The Trade Desk's services to intercept electronic communications from its Website visitors and has arranged, aided, and abetted the interception of these communications by The Trade Desk, where the data is then stored, analyzed, and potentially combined with other data in The Trade Desk's possession.

61. Franciscan receives direct benefits from implementing this tracker, including the ability to deliver targeted advertising and potentially increased advertising revenue. These benefits further establish Franciscan's responsibility for procuring the interception practices that generate these capabilities.

62. These arrangements constitute a procurement of another person to intercept electronic communications without the consent of all parties to the communication, in direct violation of 18 U.S.C. § 2511 of the ECPA.

*vi. Defendant's Failure to Obtain Consent for the Interception*

63. Franciscan fails to obtain consent from Website users before procuring the interception of their electronic communications by The Trade Desk. Franciscan's Terms of Use, Privacy Policy and Notice of Privacy Practices are displayed only as small-font links at the bottom of the Website pages, buried among many other links. Users are not required to manifest express assent to these policies and are not made aware of their existence during normal use of the Website, meaning there is no manifestation of express consent.

64. Even if users were to locate and review these policies, they do not provide adequate notice of the interception practices occurring on the Website. Rather, the Privacy Policy contains false and misleading statements about the Website's tracking practices.

65. The Privacy Policy states that Franciscan treats individually identifiable personal information "as confidential," and that individually identifiable personal information will not be disclosed "to third parties except under an agreement of confidentiality or as otherwise provided under the Terms of Use or this Privacy Policy." The policy further misleads users by stating that it "may use Individual Information you provide in a non-individually identifiable form [...] for any purpose and also may share this Aggregated Information with partners or other third parties." This incorrectly leads users to understand that any shared data is anonymous and non-individually identifiable, when in fact The Trade Desk Tracker intercepts individually identifiable information, such

as persistent TDID cookies and IP addresses, which can be linked to specific individuals and their health inquiries.

66. Franciscan's Notice of Privacy Practices also reinforces a strict standard for data sharing that is violated by its actions. In the notice, Franciscan pledges to "make sure that medical information that identifies you is kept private." It states unequivocally that "uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written permission". Crucially, the notice specifies that disclosures requiring such permission include "marketing and sale of your protected health information." The sharing of sensitive health data with The Trade Desk, a commercial advertising platform, for the purpose of targeted advertising falls into the category of "marketing." This use is not for treatment, payment, or healthcare operations and therefore requires "written permission," which Franciscan never obtains.

67. Even if Franciscan's privacy policies accurately described the nature and extent of interceptions occurring on the Website (which they do not), merely posting a privacy policy without requesting or obtaining affirmative consent does not constitute obtaining consent of all parties to the communication as required by law.

**INJURY TO PLAINTIFF AND CLASS MEMBERS**

68. Franciscan's procurement of unauthorized interception of Website user communications has caused actual harm to Plaintiff and Class members in multiple ways.

69. *Invasion of Privacy:* Medical and health-related information about individuals is highly private, and its interception can result in significant embarrassment,

stigma, and even discrimination. Plaintiff and Class members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and healthcare-related activities. These communications included searches for medical specialists, searches for treatments, and inquiries about medical conditions. The interception of these communications violated Plaintiff's and Class members' reasonable expectation that their interactions with a healthcare provider would remain private.

70. *Loss of Data Value*: Plaintiff and Class members have been deprived of the economic value of their personal data. In today's digital economy, personal data, especially health-related information, has significant commercial value.

71. In a 2014 article by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium.[1] The Commission subsequently brought a lawsuit against one of the data brokers for selling location data regarding people who visit abortion clinics for approximately $160 for a week's worth of data.[2]

72. For years, data harvesting has been one of the fastest growing industries in the United States. Conservative estimates suggest that internet companies earn hundreds of dollars per American user through the interception and use of personal data.

[1] Data Brokers, A Call For Transparency And Accountability, Federal Trade Commission, (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf

[2] *See* https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other

73. The value of health data is well-known and has been reported on extensively in the news. For example, a 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" described the extensive market for health data and noted that the market for information was both lucrative and a significant risk to privacy.[3]

74. Due to the difficulty in obtaining health information, illegal markets also exist for such personal and sensitive information. NPR reported that health data can be "more expensive than stolen credit card numbers."[4]

75. Plaintiff's and Class members' private and personal data, including their protected health information, IP addresses, and digital identifiers, have a recognized monetary value. Franciscan's procurement of unauthorized interception by The Trade Desk of this sensitive personal data has deprived Plaintiff and Class members of the economic value of their personal property without proper consideration and has resulted in Franciscan unjustly enriching itself at the expense of Plaintiff and Class members.

76. *Chilling Effect on Healthcare Communication:* Franciscan's conduct has undermined patient trust and created a chilling effect on digital healthcare communications. Plaintiff and Class members can no longer confidently use the Website to seek medical information, locate healthcare providers, research treatments, or manage their healthcare without fear that their activities are being intercepted by third parties. This

---

[3] *See* https://time.com/4588104/medical-data-industry/ (last visited May 22, 2025).

[4] Aarti Shahani, *The Black Market For Stolen Health Care Data*, NPR (Feb. 13, 2015, 4:55 am), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-forstolen-health-care-data (last visited May 22, 2025).

chilling effect may lead to reluctance to seek needed healthcare information or services online, potentially impacting health outcomes.

77. *Risk of Further Use of Intercepted Data:* Once intercepted by The Trade Desk, Plaintiff's and Class members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm.

78. *Statutory Injury:* Independent of the above harms, Franciscan's violation of the ECPA has caused Plaintiff and Class members to suffer statutory injury, entitling them to statutory damages provided by law.

## PLAINTIFF'S EXPERIENCES

79. Plaintiff Veronica Watson has been a patient of Franciscan for approximately five years and has used Franciscan's Website multiple times during that period, including in the six months preceding the filing of this Complaint. Plaintiff Watson generally accessed the Website on her iPad and also at times on her iPhone. Plaintiff accessed the Website through both the Franciscan Health application on her devices as well as the Google Chrome and Microsoft Edge browsers on those devices.

80. At various times during the relevant time period, Plaintiff Watson accessed the Franciscan Website in order to search for provider locations, doctors and medical professionals (including searches for specific OBGYN and internal medicine specialists), to search for information on treatments, and to receive health information.

## CLASS ACTION ALLEGATIONS

81. Plaintiff brings this action on behalf of herself individually and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

82. Plaintiff seeks to represent the following nationwide class:

> Class: All individuals who visited Franciscan's website in the applicable statute of limitations period and whose electronic communications with Franciscan's website were intercepted by Trade Desk and transmitted to Trade Desk without the individuals' consent.
>
> Excluded from the Class are: (a) Defendants and their officers, directors, employees, subsidiaries, and affiliates; (b) the Judge presiding over this action and any member of the Judge's immediate family and staff; (c) any juror assigned to this case; and (d) governmental entities.

83. Plaintiff reserves the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

84. *Numerosity*: The Class is so numerous that joinder of all members is impracticable. Franciscan operates twelve hospitals and numerous medical practices across Indiana and Illinois. The Website receives hundreds of thousands of visitors annually, many of whom had their communications intercepted during the relevant period. The Class size is estimated to be in the tens or hundreds of thousands.

85. *Commonality and Predominance*: There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Franciscan implemented The Trade Desk Tracker on its Website;

(b) Whether The Trade Desk Tracker intercepted Website users' electronic communications;

(c) Whether Franciscan procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d) Whether Website users consented to the interception of their electronic communications;

(e) Whether Franciscan's conduct violated 18 U.S.C. § 2511 of the ECPA;

(f) Whether Franciscan's procurement of interception of Website users' electronic communications constitutes an invasion of privacy;

(g) Whether Franciscan has been unjustly enriched through its conduct;

(h) Whether Plaintiff and Class members are entitled to damages and other monetary relief, and if so, in what amount;

(i) Whether Plaintiff and Class members are entitled to equitable relief, including but not limited to injunctive relief.

86. *Typicality*: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and Class members all visited the Website and had their electronic communications intercepted without their consent. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members and are based on the same legal theories.

87. *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

88. *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for numerous reasons. The damages suffered by many Class members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Franciscan. In contrast, a class action will present far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

89. *Injunctive Relief Appropriate*: Franciscan has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class.

## CAUSES OF ACTION

## COUNT I:

## Violations of the Electronic Communications Privacy Act (18 U.S.C. § 2511)

## (On behalf of the Class)

Plaintiff incorporates the above paragraphs by reference and further says—

90. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of electronic communications, and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

91. The ECPA protects both the sending and receipt of communications and provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

92. The transmissions between Plaintiff and Nationwide Class members and Franciscan's Website are "transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and therefore constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

93. The ECPA defines "content" to "include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The health information intercepted here, including physician searches, medical conditions, appointment requests, and treatment inquiries, constitutes content under the ECPA.

94. The Trade Desk Tracker implemented by Franciscan constitutes "electronic, mechanical, or other devices" within the meaning of 18 U.S.C. § 2510(5) because they are specifically designed to intercept and acquire the contents of electronic communications between Website visitors and Franciscan.

95. The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). As described above, The Trade Desk Tracker is embedded software that acquire the contents of users' communications as they are inputted by users into Defendant's Website, in real-time and contemporaneously with their transmission.

96. By deliberately implementing The Trade Desk tracking code on its Website, Franciscan procured The Trade Desk to intercept its visitors' electronic communications. Specifically: (a) Franciscan made the affirmative decision to embed The Trade Desk's code into its Website; (b) Franciscan's implementation of this code was the necessary predicate act that enabled The Trade Desk to intercept users' communications; without Franciscan's actions, The Trade Desk would have no access to the communications; (c) Franciscan controls which pages contain the tracking code and could have excluded it from sensitive areas where health information is transmitted, but chose not to; (d) Franciscan maintains an ongoing relationship with The Trade Desk and continues to facilitate its interception of user communications; (e) Franciscan receives benefits from this arrangement, including advertising capabilities and potentially increased revenue, creating a quid pro quo relationship.

97. Through this procurement, Franciscan caused The Trade Desk to intercept, in real-time, the electronic communications of users containing sensitive health information, in violation of 18 U.S.C. § 2511(1)(a).

98. By intentionally using or endeavoring to use the contents of these intercepted communications, knowing or having reason to know the information was obtained through illegal interception, Defendant violated 18 U.S.C. § 2511(1)(d).

99. Plaintiff and Nationwide Class members had a reasonable expectation that their communications with a healthcare provider's website would remain confidential and would not be intercepted by third parties that Franciscan had procured for commercial purposes.

100. Users did not consent to Franciscan's procurement of third-party interception and sharing of their health information for advertising and analytics purposes.

101. Franciscan was not acting under color of law when procuring these interceptions, and no other exception to ECPA liability applies.

102. As a direct result of Franciscan's violations, Plaintiff and Nationwide Class members are entitled to: (a) actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

## COUNT II:
## Invasion of Privacy — Intrusion upon Seclusion
## (On behalf of the Class)

Plaintiff incorporates the above paragraphs by reference and further says—

103. The common law tort of invasion of privacy, including the form known as intrusion upon seclusion, protects against intrusion upon the Plaintiff's seclusion or solitude, or into his or her private affairs.

104. Plaintiff had a reasonable expectation of privacy in her communications with Franciscan regarding her healthcare needs, medical conditions, and treatment preferences.

105. Franciscan intentionally intruded upon the seclusion and private affairs of Plaintiff by implementing The Trade Desk Tracker on its Website that procured the interception of sensitive, personal health information without proper authorization or consent.

106. Franciscan's intrusion upon Plaintiff's private communications would be highly offensive to a reasonable person. Internet users have a reasonable expectation that their personally identifiable communications with healthcare providers' websites will remain private.

107. Franciscan's intrusion was intentional, as it deliberately implemented The Trade Desk Tracker on its Website to capture user communications for its own business purposes.

108. As a direct and proximate result of Franciscan's invasion of their privacy, Plaintiff has suffered injury, including loss of their reasonable expectation of privacy and diminution in the value of their personal information.

109. Plaintiff is entitled to damages, including compensatory and punitive damages, in an amount to be determined at trial.

## COUNT III:
## Unjust Enrichment
## (On behalf of the Class)

Plaintiff incorporates the above paragraphs by reference and further says—

110. Franciscan has received a benefit from Plaintiff through the interception of her valuable personal data via The Trade Desk Tracker.

111. By implementing The Trade Desk Tracker on its Website, Franciscan has been able to procure the interception of users' electronic communications for business purposes, including marketing and advertising, thereby enriching itself at the expense of Plaintiff.

112. Franciscan has retained this benefit under circumstances which make it inequitable to do so without payment of its value to Plaintiff.

113. Plaintiff has suffered a corresponding detriment, including the loss of the economic value of her personal data and the invasion of her privacy.

114. It would be unjust and inequitable, and would violate fundamental principles of justice, equity, and good conscience, to allow Franciscan to retain the benefits of its unlawful conduct.

115. Plaintiff is entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Franciscan through its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the Class, appoint Plaintiff as Class representative, and appoint Plaintiff's counsel as Class counsel;

(b) Declare that Franciscan's actions, as described herein, violate the ECPA, and constitute invasion of privacy and unjust enrichment;

(c) Award Plaintiff and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiff and the Class statutory damages of $10,000 or $100 per day for each violation of the ECPA, whichever is greater, as provided by 18 U.S.C. § 2520(c)(2)(B).

(e) Award Plaintiff and the Class punitive damages;

(f) Award Plaintiff and the Class restitution and disgorgement of all profits, benefits, and other compensation obtained by Franciscan from its wrongful conduct;

(g) Award injunctive relief requiring Franciscan to cease procuring the interception of Website users' communications without proper consent; destroy all user data intercepted through The Trade Desk Tracker; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

(h) Award pre-judgment and post-judgment interest;

(i) Award reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 12, 2025

Respectfully submitted,

*/s/ Kyle Shamberg*
Kyle Shamberg
**CARROLL SHAMBERG LLC**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
kyle@csclassactions.com
(872) 215-6205